Jr. in the trial court and I represent him in this appeal. I'd like to give the court a brief factual recitation. I know you've read the brief, but I want to go over a couple of things with the court's permission. First of all, the issue of contact. My client was a businessman, a contractor, working for a contractor in Spokane, Washington, when he was contacted by Perry Adrian. At that time, Perry Adrian was not working for the FBI. During that period of time, prior to Perry Adrian going to work for the FBI, he and my client spent a lot of time together. During that period of time, Perry Adrian asked my client for a gun. Up to that point, and up until July 23rd of that year, my client had never had a gun, never possessed a gun, didn't know anything about guns, didn't know where to get guns. These requests from Perry Adrian continued, and at one point in their relationship in early July, my client, Mr. Mottola, indicated to Perry Adrian that he could get him a gun. The testimony is that my client told Perry Adrian this so that Perry Adrian would get off his back. At that point, or within a week of that point, Perry Adrian then went to the of a man who has a felony record who said he could get me a gun. Now, a little bit of history about Perry Adrian. Perry Adrian had been in the Witness Protection Program and had had contacts with federal law enforcement agencies in the past, so he knew the routine. Is there any evidence that your client, who I guess is no longer in the program and has his original identity back, is there any evidence that their meeting in Spokane, almost 3,000 miles from New York, where their earlier activities took place, was anything more than accidental? Well, that's always been the question, whether it was accidental or not. There's no evidence in the record that I'm aware of that anybody said to Perry Adrian, hey, go contact this guy. No evidence of that. If I had to guess, I would say it was accidental. The record reflects that my client needed an appraiser, called this company, apparently heard a person on the other end of the line talking with a Brooklyn accent, and so they contacted each other about six months after that, and that's how the relationship started. Now, once the FBI was contacted, the FBI then gave Perry Adrian some ideas on how to contact and request a gun from Mr. Mottola. So Mr. Adrian then went to Mr. Mottola and said, I have a friend who needs a gun. That's the testimony. The testimony from the government is that Perry Adrian went to him and said, I need a gun to go do a job, quote, unquote, in another city back east. Then came the day of the sale of the gun. My client indicates that he knew Tony Moss had a gun, and in order to get Perry Adrian to stop asking about guns, said, okay, Tony Moss has a gun, and the rest is history. It's in the record. It's in both briefs that my client went to Tony Moss' house, went in, got the gun, came back out, gave it to Perry Adrian, who then turned it over to the FBI. One of our challenges, of course, is that we need to look at this under a fairly lenient standard of review in terms of the evidence in the light favorable to the government. So I'm interested to know, other than Mr. Mottola's own testimony about entrapment, what – and the jury may or may not have believed him – what do you think is the evidence, other than his testimony, that would support the entrapment theory? Because the government, of course, has the burden on that. Right. Yes, Your Honor. The Pullman case, which I cite in my brief, I think is similar – it's a woman who is contacting a man, and the court in that case, I believe, held in the defendant's favor regarding entrapment. The question is whether or not there was any predisposition. Predisposition means prior to the government getting involved. In this case, the government didn't get involved until after Perry Adrian got involved. So the question is whether there was any predisposition prior to July 8th or 9th, when Perry Adrian went to the FBI. The only evidence of predisposition is the fact that my client told Perry Adrian, yes, I'll get you a gun, essentially saying, now get off my back. But wait a minute. If there was predisposition prior to July 7th or 8th, when Adrian became a government agent, does it have any relevance to entrapment? In other words, the entrapment has to take place during the time that Adrian was a government agent, which didn't occur until the 8th or 9th. Correct. Adrian became a government agent, and then Adrian, working for the government, started using the government's inducements. He said he'd get you a gun, but he hasn't done it. Nothing's happened. So here, try this. This is a government inducement. But do you agree we have to look at the facts as they existed on or after July 8th, 9th, and not before? Yes. Okay. I agree with that. So we have two issues in this case. One of them is the evidence issue of whether the prosecutor taunted the defendant with questions that were irregular, at best, about whether he had put on his game face and whether he had used some foul language or had not used foul language up to that point during the trial. Then, of course, the second issue is the failure of the government to prove entrapment. So with regard to the improper questions, I think the defendant was denied a fair trial because the questions that were asked, and they're in my brief, are essentially irrelevant. And I can't understand why the trial court judge would have not sustained my objection to them. When you have a defendant on the stand and he's being cross-examined by the government, I don't know how that furthers the search for truth to ask the witness whether he's put on his game face. I frankly don't even know what that means. I perceive it has something to do with sports gibberish, but I'm not sure. Well, I thought the whole gist of the questioning was that he had been well-trained when he testified against the mob years ago about how to testify. And was he doing that again today? Was he putting on his actor's testimony? Well, I think that... And I think that was the gist of the questioning as I read it. Probably was. But, you know, you're looking at it, Your Honor, after the fact. Fair. And the jury's sitting there wondering what putting on a game face has to do with this guy who's sitting here charged with felon in possession of a firearm. And I think I was as confused as the jury, and that's why I objected. Do you want to save the remaining time for rebuttal? No, I'm not going to use any more time. All right. The explanation of the government in their brief with regard to this line of questioning was that it was to test the defendant's capacity to remember events and his sincerity, truthfulness and motives. Well, it had nothing to do with sincerity, truthfulness or motives. Granted, my client had testified in New Jersey for the government, but I don't know how the two were connected. So I submit to the court that that was error. My client didn't have a fair trial. With regard to the element of the entrapment issue, the fourth paragraph in the instruction says that the jury must find that the defendant was not entrapped. Now, the jury did convict my client, but I submit that based upon the evidence that you have before you in the record, it's clear that my client had no intention of possessing or selling a firearm on July 23rd, that this constant questioning regarding the firearm was brought up at first by the independent actions of Perry Adrian and then, after a short time, by the inducements of the government acting in concert with Perry Adrian. The government tries to portray this in their brief as, in fact, on page 10 of their brief, they say that the two started discussing the issue of entrapment. Well, that's not true. The truth is that Perry Adrian started discussing and questioning the defendant as to whether he could get a firearm, and that's where it began. The government jumped in, and so I submit to the court that my client was entrapped. I ask the court for a finding of not guilty and, at the very least, a new trial based upon the evidentiary issues. Thank you, Mr. Ryan. Good morning. Please, the court. My name is Joe Harrington. I'm an assistant U.S. attorney in the U.S. Attorney's Office in Spokane, Washington. Were you the trial counsel? I was, Your Honor. Yes. I was counsel for the United States during the course of the trial. You know, in this case, the issue is probably whether the jury believed the defendant or not, and you went right about trying to destroy his credibility with those questions, which I think were inappropriate. Respectfully, Your Honor, the question about credibility did come up in this case, and on cross-examination, it was the government's intent to try to prove and at least test Mr. Metolla's demeanor on the stand, his sincerity, and his motives and truthfulness. Mr. Metolla had testified on direct examination about the fact that he had spent 54 days in trial back in New Jersey in connection with an organized crime trial, that he had had experience testifying in court and had worked with the FBI in connection with that testimony. That's all true, but what did the profanity questions have to do with his credibility? Your Honor, there was only one question about the profanity, and I think it stood in stark contrast, respectfully, about the way Mr. Metolla testified on the stand during the course of the trial and his deportment and his demeanor during the course of the transactions with Perry Adrian. Those transactions were recorded. Well, the jury got to hear those, right? They heard all of those. And it's like when people go to temple or church or courtroom, sometimes they dress a little nicer, right? That's correct, Your Honor. And they clean up their language a little nicer, right? But that doesn't make them a liar or have anything to do with their credibility, does it? Not at all, Your Honor. I mean, you could say to the guy, well, weren't you in jail dungarees just 20 minutes ago, and now you're dressed in a nice suit? Could you say that? I think it's, respectfully, Your Honor, I think the jury's unable to test someone's demeanor while they're testifying on the stand, how they testify on the stand and their deportment on the stand. I believe, well, respectfully, I believe that an argument, an appropriate argument, could be made to the jury to say, in context of the totality of all the testimony, did Mr. — the jury was able to hear Mr. Mottola during the course of the recordings, and the recordings not only with Perry Adrian but the FBI, and also how he testified in court. And I respectfully would submit that that would be something the court or the jury could weigh in analyzing credibility as — in addition to the totality of the other circumstances. How many times did you use that game-phase expression in the trial? Three times, Your Honor. Actually, three times. The fourth time, the government moved on. So the first time — and actually, what happened was the — I believe Mr. Mottola answered the questions to his benefit. The question first was asked whether he had experienced testifying in court. And he said, yes, he had. He second acknowledged that he had been assisted or coached by the FBI during the course of that prior testimony. And also it was explained to the jury that he was told to look the jury in the eye and tell the truth. He also stated that he had had an opportunity to go through the FBI reports in this case, and he said his testimony was accurate, completely accurate. What do you mean by game-phase? Trying to put on someone's best demeanor for the jury. So you're trying to discredit him right from the get-go because he was polite, assured, and testified forthrightly. Your Honor, I think in context, there had been witnesses, not only Mr. Adrian, but also Mr. and Mrs. Moss, as well as an FBI agent and some other witnesses, that had testified during the government's case in chief. The defendant then took the stand and contradicted, directly contradicted, much of that testimony according to his view of the facts. And so his view of the facts, I think, needed to be tested in context with the other testimony that came in during trial. There is no evidence that this fellow ever had anything to do with guns before this incident, so there's no predisposition to deal with guns. Is that accurate? Not according to Mr. Moss. Mr. Moss testified in the government's case in chief that Mr. Mottola had approached him on three separate occasions asking not only for a gun, but a clean gun. And he also told Mr. Moss that he was a gun collector. And so that was the timing of that, those statements. Mr. Moss testified that it was sometime, three different occasions between June or during June and July of 2004. Before or after Mr. Adrian became a government witness? Looking at Mr. Moss's testimony, that would be before and after. It would be both. There was some confusion in Mr. Moss's testimony. Was there not as to dates? Well, he said it was around that time frame. Yes, that was the testimony. It was June and July of 2004. The question about inducement, Your Honor, respectfully, is a question about why Mr. Mottola wanted to get involved in this activity. And according to the testimony of Mr. Adrian, Mr. Mottola was attempting to start up another bookmaking operation. He wanted to begin an operation to collect and take bets for the football season the following or that coming fall. And they needed some seed money. He needed some money to start that bookmaking operation. Mr. Mottola believed that if he assisted Mr. Adrian in this supposed hit in Cleveland, that there would be money available to fund the bookmaking operation. Now, remember, Mr. Mottola could have simply introduced Perry Adrian to Mr. Moss, who had the gun, and he could have just said, Mr. Moss, Mr. Adrian, meet and do your transaction. He didn't have to get involved at all. But instead, Mr. Mottola ended up brokering the deal, kept those two parties separate, made sure that Mr. Adrian remained in a car not only at Mr. Moss' business, but also at his place of residence where the gun was obtained. And he was doing this because in his tape recording he said, I've got to do this for you first, Mr. Adrian, because then we're married for life, meaning that then he would have something on Mr. Adrian to hold over his head, particularly given the fact that they're going to be entering into this other criminal adventure, a supposed criminal adventure, to engage in bookmaking operations. So it would be the government's – it was the government's position that Mr. Mottola was – wasn't induced and certainly had a predisposition, particularly given under the elements of this Court's tests, to engage in this transaction and to actually possess the firearm. If there's no other questions, I'd respectfully submit, Your Honors, that the conviction should be upheld in this case and that the defense request should be denied. Thank you. Book counsel, the case of United States v. Mottola is submitted.
judges: B. Fletcher, McKeown, Schwarzer